UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ALBERT P. MALVINO, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-401 |
| | § | |
| PAUL A. DELLUNIVERSITA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Albert P. Malvino ("Plaintiff" or "Malvino"), representative of the Estate of Bonnie Pereida ("Pereida"), filed suit against Anthony J. Delluniversita ("Anthony"), Paul A. Delluniversita ("Paul"), PCA Collectibles, Inc. ("PCA"), and PCI Coin Grading, Inc. ("PCI") (collectively "Defendants"), alleging mail and wire fraud violations under § 1962(c) and conspiracy under § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of the Texas Deceptive Trade Practices Act ("DTPA"), common law fraud, negligent misrepresentation, and common law civil conspiracy arising out of Pereida's purchase of rare coins from Defendants. Plaintiff also seeks to pierce PCI and PCA's respective corporate veils to hold the individual Defendants liable.

A bench trial was held on November 17, 2014. Pursuant to Federal Rule of Civil Procedure 52, this Court makes the following Findings of Fact and Conclusions of Law. Any findings of fact that are more properly construed as a conclusion of law shall be so construed and vice versa.

1 / 30

## FINDINGS OF FACT

**A.    Plaintiff Malvino and Bonnie Pereida**

1.    Pereida, a Corpus Christi, Texas resident, was a stockbroker for 51 years and was First Vice President of the Corpus Christi branch of Merrill Lynch.

2.    Malvino, whose testimony at trial was highly credible, was engaged to and lived with Pereida prior to her death.

3.    After the market crash of 2008, Pereida decided to invest in rare coins as a way to protect her assets against inflation.

4.    In 2010, Pereida began purchasing rare coins.  In time, Pereida's rare coin investments became a large part of her estate.

5.    According to Malvino, he and Pereida "were looking forward to a nice retirement" based on the appreciating value of the investments.

**B.    Defendants**

6.    PCA is a New York-based rare coins dealer.  It purchases ungraded coins, grades the coins—sometimes through an independent third party grader—and sells the coins to customers.

7.    PCA employs a team of sales representatives who solicit customers through a telemarketing operation.

8.    PCA failed to follow a number of corporate formalities, including issuing stock, finalizing by-laws, and executing organizational meeting minutes.   (Plaintiff's Exhibit 22).

9.     Defendant Anthony owns 60% of PCA while his son, Defendant Paul, owns 40% of the company.  PCA distributes 60% of its earnings to Anthony and 40% to Paul on a weekly basis.

10.    Paul serves as PCA's president, but he is only a "figurehead" or "paper" president and his only responsibility is to make sure that salespersons are on the phone.[1]

11.    Anthony manages all PCA operations not handled by Paul, including the training of sales representatives and the setting of coin prices.

12.    In November of 2010, Anthony purchased PCI, a coin grading company. Anthony solely-owned and operated PCI, acting as its only coin grader.

13.    Paul was unaware that Anthony was PCI's sole grader and testified that no one at PCA knew that Anthony owned PCI.  Anthony testified that he did not inform Paul that he was PCI's sole grader because "it was not his concern."

14.    PCI also failed to follow corporate formalities.  It failed to maintain financial records, hold stockholder meetings, file income tax returns, adopt by-laws, prepare corporate minutes, and establish a bank account.

15.    Anthony sold PCI in December of 2011.

**C.     Pereida Purchases 135 Rare Coins from PCA**

16.    From January through May of 2011, Pereida made 31 separate purchases of rare coins from PCA.  Pereida purchased a total of 135 coins, with each transaction ranging from $1,595.00 to $122,500.00.  (Plaintiff's Exhibit 29).  Pereida paid a total of $727,569.00 to PCA for the coins.

---

[1]   All quotes are based on audio recordings of the trial testimony because there are no trial transcripts.

17.   Pereida paid for each transaction either through an internet credit card charge or a personal check mailed to PCA through the United States Postal Service (USPS).

18.   After each purchase, PCA sent Pereida an invoice through the USPS which listed the coins purchased.  Each invoice provided the sales price and the description and grade of each coin as determined by "independent third party" grader PCI.[2]

19.   Each invoice stated that "[a]ny item found not to be satisfactory[] must be returned by the 15th day of receipt.  After that all sales are final.  All items are guaranteed to be authentic."  (Plaintiff's Exhibit 2).

20.   On January 20, 2011, PCA sent Pereida a numismatic guide book, commonly known as the "Red Book."[3]  (Plaintiff's Exhibit 2; 35).  The Red Book sets forth the estimated value of coins based on their grade level.

21.   Malvino and Pereida used the Red Book to assess the value of the PCA coins based on the grade established by PCI.

22.   Malvino testified, "we were happy to see the prices in the Red Book and compared them to the prices on the [PCA] invoice . . . because the prices [in the Red Book] were higher and we thought 'oh that's wonderful,' we bought these [coins] for our retirement . . . and we thought . . . we're getting a good deal . . . ."

---

[2]   The terms of sale stated that "[a]ll grading terms are the opinion of PCA or [an] independent third party grader." (Plaintiff's Exhibit 2).

[3]   R.S. Yeoman, The Official Red Book: A Guide Book Of United States Coins (Kenneth Bressett ed. 64th ed. 2010).

23.   The evidence illustrates that Pereida relied on the representations in the invoices. And Anthony testified at trial that Pereida should have relied on the coins' grades as stated in the invoices.

**D.   PCA Misrepresented that its Coins Were Independently Graded**

24.   Paul testified that PCA made representations to Pereida through the invoices and that PCA "stands behind" its representations.  However, the coins were not graded by an independent third party grader, but by Anthony—PCA's dominant shareholder and PCI's sole-owner.  *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (a company's director is not disinterested when he stands on both sides of a transaction).

25.   Anthony purchased raw coins through PCA, personally graded the coins through PCI at no charge to PCA, and sold the graded coins through PCA—intentionally creating the impression that the coins were graded by an independent company.

26.   After assigning each coin a grade, Anthony priced it according to the value in the *Coin Dealer Newsletter*, more commonly known as the "Grey Sheet."[4]

27.   PCI never charged PCA for its grading services and only graded "maybe 20 coins" for other clients.

**E.   Systematic Over-Grading of Coins**

28.   After Pereida died in October of 2011, Malvino was appointed executor of her estate and had the coins appraised for tax purposes.

---

[4]   The Grey Sheet periodically reports the "bid" and "ask" prices among dealers for coins.

29.   Malvino retained Heritage Auction Appraisal Services, Inc. ("Heritage"), one of the nation's leading and largest coin valuation and auctioning companies.

30.   Heritage conducted the appraisal according to the 2012-13 edition of the Uniform Standards of Professional Appraisal Practice published by the Appraisal Foundation of America.

31.   According to Heritage, the fair market value of the coins as of October 29, 2011, was $190,865.00—26.2% of the amount paid by Pereida.  (Plaintiff's Exhibit 28).

32.   Heritage concluded that PCI over-graded coins, failed to identify a counterfeit coin, and failed to properly grade "cleaned"[5] coins.  (Plaintiff's Exhibit 7, p. 24).

33.   Malvino then retained Paul Montgomery ("Montgomery") to assess the grade and value of each coin.

34.   Montgomery has over 30 years of experience as a precious metals trader, professional numismatist, and appraiser.   He is the former president of the Professional Numismatics Guild (PNG), an organization formed to establish and maintain high standards in the coin industry.   Among other achievements, Montgomery received the *Sol Kaplan Award* for his work against fraud in the coin industry.

35.   Montgomery's findings were generally consistent with those of Heritage.  Based on his grading of each coin and its value as established by the Grey Sheet, Montgomery concluded that the reasonable retail value of the coins was

---

[5]   "Cleaning" describes the chemical treatment of a coin's surface to improve its appearance and desirability. Cleaning can severely damage a coin and is not an acceptable technique to enhance the grade of a coin.  (Plaintiff's Exhibit 10).

$150,964.00 at the time Pereida purchased them from PCA—20.8% of the amount she paid.[6]  (Plaintiff's Exhibit 29).

36.   Montgomery also found a consistent pattern of over-grading coins and selective over-grading to take advantage of dramatic changes in valuation for small grade variances.[7]  He graded each coin lower than PCI did, with some being graded 19 to 23 levels lower.  (Plaintiff's Exhibit 27).

37.   Like Heritage, Montgomery identified a counterfeit coin.  He also identified 25 coins that were ungradable because they were either cleaned or damaged.

38.   Montgomery requested a second independent grade appraisal to verify his conclusions.   Professional Coin Grading Service ("PCGS") conducted the appraisal, and Anthony acknowledged at trial that PCGS is one of the top coin grading services in the nation.

39.   PCGS and the Numismatic Guaranty Corporation ("NGC"), the grading companies with the most credibility, use "consensus grading," a process where three graders (who have no interest in a coin) grade the coin in an effort to reach a consensus grade.  These graders are not allowed to participate in the coin business.

40.   PCGS's findings were consistent with those of Montgomery.  It also assessed every coin at a lower grade level than PCI did, and it agreed with Montgomery

---

[6]   Because the Grey Sheet establishes trading prices for coins between dealers, Montgomery included an average market markup of 10% to his valuation.

[7]   The value of some coins can vary dramatically within a few grade levels.  For example, a 1911-D $5 Gold Indian Head coin graded at MS-63 is generally valued at $40,000.00 while the same coin graded at MS-60 is generally valued at $6,750.00.  (Plaintiff's Exhibit 35, p. 257).  In selective over-grading, dealers identify coins with similar dramatic value spreads and grade them artificially high to significantly overcharge buyers.

that 26 of the 135 coins were ungradable because of their condition or lack of authenticity.

41.   The assessments by PCGS and Montgomery were within two grade levels of each other for a majority of the coins and nearly 90% of the assessments were within three grade levels of each other.  (Plaintiff's Exhibit 27).

42.   Montgomery testified that coin grading is subjective, but should adhere to industry standards.

43.   Anthony had no formal training as a coin grader, had not attended a coin grading program, and did not rely on consensus grading.

44.   Regarding the Red Book, Montgomery, who is a regular Red Book contributor, testified that collectors consistently rely on and draw conclusions from the book to determine a coin's relative value.

45.   This Court finds that a reasonable and prudent coin dealer would not have sold the counterfeit coin to Pereida and would not have represented that the cleaned coins had a grade of 60 or higher.

46.   This Court finds that Pereida was not an astute coin collector and was clearly deceived.

47.   This Court finds that Anthony, through PCA and PCI, orchestrated a systematic over-grading scheme, and that PCA and PCI made misrepresentations to Pereida which caused her to suffer economic damages in the amount of $536,934.00—the difference between what she paid for the 135 coins ($727,569.00) and their fair market value as established by Heritage ($190,635.00).

## CONCLUSIONS OF LAW

**A.     Jurisdiction**

1.      This Court has federal question jurisdiction over this action pursuant to RICO, 18 U.S.C. § 1964(a), (c).  28 U.S.C. § 1331.  This Court has diversity jurisdiction because the matter in controversy exceeds $75,000, and the parties are citizens of different states.   28 U.S.C. § 1332(a).   And this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over state law claims.

**B.     Texas Deceptive Trade Practices Act ("DPTA")**

2.      The Texas Supreme Court has not addressed whether claims under the DTPA survive the death of a consumer.  *See Shell Oil Co. v. Chapman*, 682 S.W.2d 257, 259 (Tex. 1984) (stating that it "reserve[s] to another day" the issue of DTPA survivability); *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1427 (5th Cir. 1992) (certifying the question of DTPA's survivability to the Texas Supreme Court).  The intermediate appellate courts in Texas are split on the issue.  *See McCoy v. Pfizer Inc.*, 2010 WL 3365284, at *4 (E.D. Tex. Aug. 3, 2010) (collecting cases).

3.      At least four federal courts have found that a Texas DTPA claim did not survive death.  *Launius v. Allstate Ins. Co.*, 2007 WL 1135347 (N.D. Tex. Apr. 17, 2007); *Lofton v. McNeil Consumer & Specialty Pharm.*, 682 F. Supp. 2d 662 (N.D. Tex. 2010); *McCoy*, 2010 WL 33655284; *Boudreaux v. Corium Intern., Inc.*, 2013 WL 1890269 (N.D. Tex. May 7, 2013).

4.    The *Launius* court, relying on the Texas Supreme Court's reasoning in *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd.*, 146 S.W.3d 79 (Tex. 2004), and on three San Antonio Court of Appeals decisions, made "an *Erie* guess" and held that "[i]f DTPA claims cannot be assigned because of their personal and punitive attributes [as established by *PPG Industries*], then this Court fails to see how such claims can survive the death of a consumer given the common law rule holding that actions to vindicate personal rights terminate with the death of the aggrieved party."  2007 WL 1135347, at *5.

5.    The *Boudreaux* court stated, "this district has confronted [the question of DTPA's survivability] at least three times after the *PPG Industries* decision, and each time, after noting the split of authority among the intermediate appellate courts, the court nonetheless held that DTPA claims do not survive the death of the consumer."  2013 WL 1890269, at *3 (citations omitted).

6.    This Court finds the reasoning in these cases persuasive and joins them in holding that Texas DTPA claims do not survive the death of the consumer.  Consequently, Plaintiff's DTPA claims are dismissed.

**C.    Common Law Fraud**

7.    Under Texas law, a plaintiff must show the following elements to support an action for fraud based on misrepresentation: (1) defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the

representation with the intent that the other party should act upon it; (5) the party

acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337

(Tex. 2011).

8.   To constitute actionable fraud, false representations must relate to material facts,

as distinguished from matters of opinion, judgment, or expectation.  *First USA*

*Mgmt., Inc. v. Esmond*, 911 S.W.2d 100, 108 (Tex. App.—Dallas 1995), *aff'd in*

*part, rev'd in part on other grounds* 960 S.W.2d 625 (Tex. 1997).   An opinion

may constitute fraud if the speaker had knowledge of its falsity.  *Trenhold v.*

*Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983).

9.   Paul acknowledged at trial that PCA made a material representation through the

invoices that each coin was of a certain grade as determined by an independent

third party grader.   These representations were false because PCI was not an

independent third party grader as it was wholly-owned and operated by

Anthony—PCA's majority owner and the person in clear control of its operation.

10.   PCI made material representations regarding the grade of each coin.[8]   These

representations were false because PCI systematically over-graded the coins sold

by PCA to Pereida.  *See United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986)

(affirming mail fraud conviction against coin dealer by holding that evidence

---

[8]   The fact that PCI did not make the representation directly to Pereida does not defeat the common law fraud claim.
The Texas Supreme Court has stated that its "fraud jurisprudence has traditionally focused not on whether a
misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on
whether the misrepresentation was intended to reach a third person and induce reliance." *Ernst & Young, L.L.P. v.
Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).  "[A] misrepresentation made through an intermediary is
actionable if it is intended to influence a third person's conduct." *Id.*

established the existence of official grading standards that "while not having the force of law, were recognized by the government's experts as having wide acceptance in the industry" and noting that the dealer's markups sometimes exceeded costs tenfold).

11.   Under Texas law, "[a] corporation can act and acquire knowledge only through its agents.  Knowledge held by corporate officers or directors may be imputed to the corporation itself." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston 2008, pet. denied) (citing *Poth v. Small, Craig, & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied)).  Knowledge held by employees with broad control, even if they are not officers, can also be imputed to the corporation.  *See Poth*, 967 S.W.2d at 515.

12.   This Court concludes that Anthony's acts and knowledge are imputed to PCI as he was the company's sole officer and director.  Additionally, Anthony's acts and knowledge are imputed to PCA because he had broad control of the company.

13.   Because Anthony graded the coins, set coin prices, and managed all relevant operations at PCA other than those handled by Paul, this Court concludes that PCA and PCI, through Anthony, knew that their representations were false.

14.   This Court concludes that PCI and PCA made the representations with the intent that Pereida should act upon them, and that Pereida reasonably relied on the representations.  PCI over-graded the coins so that Pereida would pay more than the value of the coins.  PCA represented that the grade of each coin was determined by an independent third party so that Pereida would accept the grade

and pay the price set by PCA.  Pereida relied on the grade of the coins as stated in

PCA's invoices, and she reasonably relied on the value of the coins provided in

the Red Book.  Pereida did not have training or education to assess the value of the

coins and thus relied on Defendants' representations.  There is no evidence that

Pereida purchased the coins in order to finalize a collection or for other hobby-

related, non-pecuniary purposes.  Defendants' reliance on *Hall v. Douglass*, 380

S.W.3d 860 (Tex. App.—Dallas 2012, no pet.) is misplaced because the facts are

distinguishable from this case.

15.   As a result of the false representations, Pereida suffered injury in the amount of

$536,934.00 (economic damages).

16.   This Court concludes that PCI and PCA are liable to Plaintiff for common law

fraud.

**C.  Negligent Misrepresentation**

17.   To establish a claim for negligent misrepresentation, a plaintiff must show that:

(1) the defendant made a representation in the course of its business or in a

transaction in which the defendant had a pecuniary interest; (2) the defendant

supplied "false information" for the guidance of others in their business; (3) the

defendant did not exercise reasonable care or competence in obtaining or

communicating that information; and (4) the plaintiff suffered pecuniary loss by

justifiably relying on the representation.  *Fed. Land Bank Ass'n of Tyler v. Sloane*,

825 S.W.2d 439, 442 (Tex. 1991).

18.   As already discussed, PCI and PCA made misrepresentations in the course of their business. PCI misrepresented the grades of the coins and provided those misrepresentations to PCA, who then misrepresented the independent nature of the coin grader.[9]

19.   PCA failed to exercise reasonable care in disclosing the nature of its relationship with PCI.  And PCI failed to exercise reasonable care in grading the coins.  PCI failed to adhere to any of the industry-recognized grading standards discussed by Montgomery, and it systematically over-graded the coins sold to Pereida.  *See United States v. Numisgroup Int'l Corp.*, 368 F.3d 880 (2d Cir. 2004), *rev'd sub nom. on other grounds*, *Dupurton v. United States*, 543 U.S. 1098 (2005) (recognizing that "while subjectivity in the grading process may justify some variation in grading, this subjectivity factor cannot account for the huge difference in the grade and value of the coins.") (internal quotations omitted); *Kail*, 804 F.2d at 445.

20.   A plaintiff's reliance on a representation may be unjustified if there are "red flags" indicating that reliance is unwarranted.  *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).  The Court concludes that there were no "red flags" rendering Pereida's reliance unjustifiable.  Pereida had

---

[9]   The fact that PCI did not make the representation directly to Pereida does not defeat the negligent misrepresentation claim.  The Texas Supreme Court held that "[t]he theory of negligent misrepresentation permits plaintiffs who are not parties to a contract for professional services to recover from the contracting professionals." *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999).  This is so because "liability is not based on the breach of duty owed by a professional to his client or others in privity; instead, liability is based on the 'professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely.'"  *Wright v. Sydow*, 173 S.W.3d 534, 554 (Tex. App.—Houston 2004, pet. denied) (quoting *McCamish*, 991 S.W.2d at 792).

no reason to suspect that PCI was not a legitimate, independent grader.  Pereida had no reason to suspect that Anthony, PCA's majority owner, controlled PCI. Pereida also had no reason to suspect that the coins she purchased as an investment were worth $536,934.00 less than what she paid.

21.   The Court concludes that PCI and PCA are liable to Plaintiff for negligent misrepresentation.

## D.   RICO

### i.   *Survivability*

22.   "[T]he question of survival of a federal cause of action has usually been described as a question of federal common law, in the absence of an expression of contrary intent."  *James v. Home Const. of Mobile, Inc.*, 621 F.2d 727, 729 (5th Cir. 1980). A cause of action that is penal generally does not survive the death of a party while an action that is remedial in nature does survive. *See Matter of Wood*, 643 F.2d 188, 190 (5th Cir. 1980).

23.   RICO claims do not fit neatly into the penal/remedial framework.  The Fourth Circuit in *Faircloth* stated, "civil RICO is a square peg, and squeeze it as we may, it will never comfortably fit in the round holes of the remedy/penalty dichotomy. Nonetheless, we must fit it as best we can."  *Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991).  The Fourth Circuit concluded that, "[c]onstruing it liberally, as Congress directed, we think that civil RICO claims should survive."  *Id.*

24.   The Fifth Circuit has not addressed the survivability of civil RICO claims.  The Southern District of Texas, relying on the only appellate court to address the

question, held that RICO claims survive the death of the injured party. *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 691 (S.D. Tex. 2009) (adopting the "principled reasoning" of *Faircloth)*.

25.   This Court agrees with *Faircloth*'s conclusion that RICO claims survive the death of the injured party.

### *ii. RICO Mail and Wire Fraud*

26.   Section 1962(c) of the RICO statute makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

27.   To prevail under a RICO claim, a plaintiff must show that a defendant is: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988).

28.   A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

29.   The RICO person must be distinct from the RICO enterprise. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 445 (5th Cir. 2000). A corporate owner or employee is distinct from the corporation for RICO purposes. *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  And we can find nothing in the [RICO] statute that requires more 'separateness' than that.").  In *Cedric Kushner Promotions,* the RICO person was the president and sole shareholder of the RICO enterprise, and the Supreme Court found that the person was separate and distinct from the enterprise.  533 U.S. at 160.

30.   A pattern of racketing activity has two components: a predicate racketeering activity and a pattern of such acts.  *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993).  Mail fraud and wire fraud are both "predicate crimes" that may form the basis of RICO liability.  *See, e.g.*, *Brown v. Nationsbank Corp.*, 188 F.3d 579, 588 (5th Cir. 1999).

31.   A claim of RICO mail fraud requires a plaintiff to show: (1) a scheme to defraud or to obtain money by means of false or fraudulent representation; (2) interstate or intrastate use of the mails to execute the scheme; (3) the use of the mails by the defendant connected to the scheme; and (4) actual injury to the business or property of the plaintiff.  *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 428 (5th Cir. 1990).  A claim of RICO wire fraud requires a showing of essentially the same elements, except that the communication must be interstate.  *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988).

32.   Establishing a pattern of racketeering requires "both that the acts are 'related' to each other and that they have 'continuity.'"   *In re Burzynski*, 989 F.2d at 742 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

33.   Here, Plaintiff identified Anthony, Paul, and PCA as RICO "persons."   And Plaintiff identified PCI and PCA as the RICO "enterprise."

34.   The evidence establishes that Paul was not employed by or involved in the management of PCI nor was he aware of Anthony's scheme to defraud Pereida through PCA.   Thus, the Court concludes that Paul did not violate § 1962(c).

35.   This Court concludes that Anthony is separate and distinct from PCI and PCA for RICO purposes.   This Court further concludes that Anthony and PCA (the RICO persons) engaged in mail and wire fraud by scheming to defraud Pereida through PCI (the RICO enterprise).   As previously addressed, Anthony's scheme of over-grading coins through PCI, and PCA's misrepresentation that the coins were graded by an independent grader constituted fraudulent misrepresentations.   PCA used the interstate mails and wires to execute the fraud by relying on internet credit card payments and by using USPS to deliver its goods and invoices.   As a consequence, Pereida was injured financially.

36.   This Court concludes that Anthony and PCA's conduct constitutes a pattern of racketeering because they committed mail and wire fraud against Pereida on at least 31 separate occasions and these acts were related to each other as they stemmed from the same fraudulent scheme against Pereida, continuously executed from January 20, 2011, through May 24, 2011.

37.   This Court concludes that Anthony and PCA, the two RICO persons, violated § 1962(c).  *Delta Truck*, 855 F.2d at 242 ("The object of all civil and criminal RICO actions is the RICO 'person,' the defendant.").

### iii.   *RICO Conspiracy*

38.   To prove a conspiracy under § 1962(d) of RICO, a plaintiff must establish "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999).

39.   The Court has concluded that Anthony and PCA violated §1962(c).  The question now is whether Anthony and PCA can conspire with one another under the law.

40.   Generally, under the intracorporate conspiracy doctrine, a corporation cannot conspire with its employees.  *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) ("[A] corporation cannot conspire with itself any more than a private individual can and it is the general rule that the acts of the agent are the acts of the corporation.") (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1981)).

41.   The Fifth Circuit has not addressed whether a corporation can enter into a RICO conspiracy with its own officers.  Other circuit courts are split on the issue. *Compare Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (holding that intracorporate conspiracies are actionable under RICO), and *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996) (same), *with Fogie v. THORN Am., Inc.*, 190 F.3d 889, 899 (8th Cir. 1999) (holding that the

intracorporate conspiracy doctrine applies to RICO claims and thus intracorporate conspiracies are not actionable under RICO), and *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (same).

42.  In *Ashland Oil*, the Seventh Circuit stated that intracorporate conspiracies threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers. 875 F.2d at 1281.

43.  "[A] possible exception to the intracorporate conspiracy doctrine exists where corporate employees act for their own personal purposes." *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998).  *See also Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987) ("While it is true that a corporation cannot conspire with itself, an intracorporate conspiracy may be established where individual defendants are also named and those defendants act outside the scope of their employment for personal reasons.").

44.  This Court concludes that intracorporate conspiracies are actionable under RICO. Even if they are not, the intracorporate conspiracy doctrine does not shield Anthony from liability under these circumstances because he was acting outside the scope of his employment for personal reasons—to increase his earnings by defrauding Pereida.  Anthony personally profited from over-grading the coins.

45.  This Court concludes that Anthony and PCA knowingly agreed to commit a violation of RICO § 1962(c), and thus are liable to Plaintiff under § 1962(d).

E.     **Common Law Civil Conspiracy**

46.    A plaintiff must prove the following elements to establish a claim for civil conspiracy: (1) two or more persons, (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 553 (5th Cir. 2012) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex.1998)).

47.    This Court concludes that PCI and PCA had a meeting of the minds on a course of action and took illegal overt acts to defraud Pereida—proximately causing economic damages of $536,934.00.

48.    PCI and PCA are jointly and severely liable to Plaintiff under Texas common law civil conspiracy for the economic damages resulting from the fraud perpetrated against Pereida.

F.     **Piercing the Corporate Veil**

49.    "The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations . . . ."  *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986).  However, the Texas Supreme Court has observed that courts may "disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."  *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2009).

50.   The corporate fiction is disregarded: "(1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong." *Castleberry*, 721 S.W.2d at 272.  At issue here are the first two examples—a sham to perpetrate a fraud and alter ego.

### i. Sham to Perpetrate Fraud

51.   The sham to perpetrate a fraud doctrine is designed "to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice . . . ." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643-44 (5th Cir. 1991) (citing *Castleberry*, 721 S.W.2d at 273).  "Sham to perpetrate a fraud is an equitable doctrine, and Texas courts take a flexible fact-specific approach focusing on equity." *Id.* (internal quotation marks and citation omitted).  "*Castleberry* establishes that the sham to perpetrate a fraud doctrine is much broader than the alter ego doctrine." *Id.* (citing *Castleberry*, 732 S.W.2d at 277).

52.   As previously discussed, Anthony, through PCI and PCA, orchestrated a fraud against Pereida.  Anthony used the appearance of PCI as a separate corporation to deceive Pereida into believing that she was purchasing independently-graded coins through PCA.  The Court concludes that Plaintiff can pierce PCI and PCA's

respective corporate veils to hold Anthony personally liable for the economic and exemplary damages established under the common law fraud claim.

53.   The Court concludes that Plaintiff cannot pierce PCI and PCA's respective corporate veils to hold Paul personally liable because he was not aware of or involved in the scheme to defraud Pereida.

54.   Because the Court concludes that Plaintiff can pierce PCI and PCA's respective corporate veils to hold Anthony personally accountable under the sham to perpetrate a fraud theory, it is not necessary to address Plaintiff's alter ego veil piercing theory.

## I.  Damages

## 1.  Common Law Fraud

55.   In fraud cases, Texas law allows for the recovery of economic, mental anguish, and exemplary damages, but not attorney's fees.  *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

56.   Pereida is entitled to an award of $536,934.00 jointly and severally from PCI and PCA for economic damages.[10]   Furthermore, as discussed above, Anthony is personally liable to Plaintiff for payment of this judgment under a piercing the corporate veil theory.

57.   A court may award exemplary damages in a fraud action if the plaintiff's proof of fraud was accomplished by clear and convincing evidence.  Tex. Civ. Prac. &

---

[10]   When the tortious conduct of two or more parties works together to create a single injury, which by its nature cannot be apportioned between the parties with any certainty, all of the tortfeasors will be jointly and severally liable.  *Hoenig v. Tex. Commerce Bank, N.A.*, 939 S.W.2d 656, 662 (Tex. App.—San Antonio 1996, no writ).

Rem. Code Ann. § 41.003(a).  The determination of whether to award exemplary damages and the amount is within the discretion of the trier of fact.  Tex. Civ. Prac. & Rem. Code Ann. § 41.010(b).

58.   The Court concludes that there is clear and convincing evidence of the fraud perpetrated by PCI and PCA against Pereida.  Plaintiff is thus entitled to exemplary damages.

59.   In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant.  Tex. Civ. Prac. & Rem. Code Ann. § 41.011(a).

60.   Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1) (a) two times the amount of economic damages; plus (b) an amount equal to any noneconomic damages . . . not to exceed $750,000; or (2) $200,000.  Tex. Civ. Prac. & Rem. Code Ann. § 41.011(a).

61.   There was no evidence of noneconomic damages.  Exemplary damages are therefore limited to no more than twice the amount of economic damages— $1,073,868.00.

62.   The nature of the wrong and the character of the conduct involved here are egregious.  PCI and PCA misled Pereida into buying coins that were counterfeit, damaged, or worth only a fraction of what they were represented to be.  Pereida

was an elderly individual nearing retirement age, with no experience in coin collecting.

63.   The Court awards Plaintiff exemplary damages in the amount of $536,934.00.

64.   PCI and PCA will each be liable for $268,467.00—half the exemplary damages award.[11]   Furthermore, Anthony is personally liable to Plaintiff for payment of this judgment under a piercing of the corporate veil theory.

**2.  Negligent Misrepresentation**

65.   Damages for negligent misrepresentation claims include the "difference between the value of what [plaintiff] has received in the transaction and its purchase price or other value given for it" and other consequential damages that can be classified as pecuniary losses.  *Sloane*, 825 S.W.2d at 442 (citing Restatement (Second) of Torts §552B (1977)).

66.   Plaintiff did not identify consequential damages.  As a result, the Court concludes that Pereida is entitled to $536,934.00 in damages jointly and severally from PCI and PCA under the negligent misrepresentation claim.

**3.  RICO**

67.   For RICO violations, "[a]ny person injured in his business or property by reason of violation of § 1962 of this chapter may sue . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18. U.S.C. § 1964(c).

---

[11]   "In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant."  Tex. Civ. Prac. & Rem. Code Ann. § 41.006.

68.   Therefore, Plaintiff is entitled to a damages award of $1,610,802.00—three times the damages Pereida sustained—against Anthony and PCA, jointly and severally, under the RICO claims.[12]   Plaintiff is also entitled to a reasonable attorney's fee award of $280,190.00, an amount discussed below, against Anthony and PCA, jointly and severally.[13]

69.   Plaintiff is also entitled to an award of $1,332.45 for cost of the suit against Anthony and PCA, jointly and severally.

**4.    Attorney's Fees**

70.   The party seeking attorney's fees bears the burden of establishing the reasonableness of the fees by submitting adequate documentation and time records of the hours reasonably expended and proving the exercise of "billing judgment." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997).   An attorney's fee application should include "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).   The court may exclude hours that are not properly documented.   *See Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983) ("[W]here the documentation of hours is inadequate, the district court may reduce the award accordingly.").

---

[12]   Defendants' liability to Plaintiff for RICO-related damages is joint and several. *See Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) ("Defendants all participated in the 'enterprise' responsible for the RICO violation; awarding damages separately between each plaintiff and defendant is inconsistent with the nature of the injury [defendants] inflicted and brings about a danger of multiplying damages before they are trebled."); *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations.").

[13]   *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1570-71 (1st Cir. 1994) (holding defendants jointly and severally liable for reasonable attorney's fees under 18 U.S.C. § 1964(c)).

71.  Generally, the determination of a reasonable hourly rate for attorneys in a particular community is established by affidavits of other attorneys of similar caliber practicing in that community.  *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993); *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).

72.  Reasonable attorney's fees are calculated through a two-step process called the lodestar method.  *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-24 (5th Cir. 1995).  As a preliminary step, the district court must determine the reasonable number of hours expended by the attorney and the reasonable hourly rate for the attorney.  The lodestar amount is then calculated by multiplying the reasonable number of hours by the reasonable hourly rate.  *Id.* at 324.  The lodestar amount may then be adjusted up or down based on the twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

73.  The *Johnson* factors include: (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 800 n. 18 (5th Cir. 2006).

74.  Plaintiff calculated a lodestar amount of $374,832.50[14] (attorney billing: 1,021.2 hours at $350/hour; paralegal billing: 139.3 hours at $125/hour).  D.E. 146; 147.

75.  The Court concludes that the amount of hours submitted by Attorney Lyn Stevens are reasonable because of the case's broad discovery, the number of pre-trial motions and hearings, and the complexity associated with the legal claims.  D.E. 149, pp. 3-4; 149-1.   Defendants' objections to Mr. Stevens's declaration regarding reasonable and necessary attorney fees (D.E. 148) are overruled.

76.   Defendants' objections to Attorney Austin Anderson's declaration (D.E. 148) are sustained.  The Court is unable to determine the reasonableness of the fee because there is no documentation of billing records to support the attorney's fees. Consequently, the Court will exclude Mr. Anderson's hours in determining reasonable attorney's fees (attorney billing: 255.3 hours; paralegal billing: 42.3 hours).

77.   The Court concludes that $350.00 per hour is a reasonable hourly rate and within the range of customary fees charged for this type of case by someone with similar experience working in this geographic area.  *See* D.E. 145 (declaration of Rick Holstein stating that a $350.00 hourly rate was "within the range of rates normally and customarily charged in the State of Texas by attorneys and professionals of similar qualifications and experiences in cases of this kind").

---

[14]  Plaintiff's counsel erroneously stated in the Declaration of R. Lyn Stevens Regarding Reasonable and Necessary Attorney Fees that 765.9 hours multiplied by an hourly rate of $350.00 totaled $267,995.00; this amount should read $268,065.00.  D.E. 147, pp. 3-4.

78. The Court thus calculates a lodestar base amount of $280,190.00 (attorney billing: 765.9 hours at $350.00/hour; paralegal billing: 97.0 hours at $125.00/hour).

79. The Court concludes that the lodestar amount is reasonable in light of the evidence presented regarding some of the *Johnson* factors. The lodestar amount adequately represents the time and labor required for which evidence was presented; the case presented a number of novel legal issues; the amount reasonably compensates Plaintiff's counsel based on the skill required to perform the legal services properly, and based on counsel's experience, reputation, and ability; the hourly fee reflects that charged for similar services in the community; and the award is reasonable in light of the amount of the loss involved and the result that was obtained.

80. Therefore, the Court concludes that Plaintiff is entitled to $280,190.00 in reasonable attorney's fees.

## CONCLUSION

For the reasons stated above:

- On the claim for common law fraud, Plaintiff is entitled to recover from PCI and PCA, jointly and severally, the sum of $536,934.00 for economic damages along with pre and post-judgment interest, and court costs of $1,332.45 and may hold Anthony personally liable for these amounts. Plaintiff is also entitled to recover an additional $536,934.00 for exemplary damages—$268,457.00 from PCI and $268,934.00 from PCA—along with post-judgment interest and may hold Anthony personally liable for these amounts.

- On the claim for negligent misrepresentation, Plaintiff is entitled to recover from PCI and PCA, jointly and severally, the sum of $536,934.00 in damages along with pre and post-judgment interest, and court costs of $1,332.45.

- On the RICO claims, Plaintiff is entitled to a damages award of $1,610,802.00 against Anthony and PCA, jointly and severally, along with post-judgment interest, attorney's fees of $280,190.00, and cost of the suit of $1,332.45.

Given these findings of fact and conclusions of law, Plaintiff is ORDERED to file a motion for judgment which includes an election of remedies and a proposed judgment by June 10, 2015.  Defendants are ORDERED to file any response to the motion for judgment 21 days after the filing of the motion.

ORDERED this 20th day of May, 2015.

_____
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE